UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. District Court
Wisconsin Eastern

JUN 16 2026

FILED
Clerk of Court

JUSTIN GAVERY et al.,

Plaintiffs,

v.

DOUGLAS HAAG et al.,

Defendants.

Case No. 2:25-cv-01970-WCG

**PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

INTRODUCTION

1. Plaintiffs Justin Gavery, Joseph Nolan, and Peter Bernegger respectfully submit this combined

response in opposition to the motion to dismiss filed by Defendants City of Milwaukee, Douglas

Haag, Kathryn Z. Block, Patricia Ruiz-Cantu, and Terrell Martin (the "moving Defendants").

Defendant Paulina Gutierrez, who is also named in the Second Amended Complaint ("SAC") and

was served with the summons and second amended complaint on June 4, 2026, as reflected in the

process server's sworn proof of service, did not join the motion; her separate position is addressed

in Part XI. For convenience, "Defendants" in this response refers to the five moving Defendants

unless otherwise noted. The motion should be denied.

1

2. The motion attacks a case Plaintiffs did not bring. On every page it reduces the Second Amended Complaint ("SAC") to a claim that Plaintiffs were "entitled to win" a list-maintenance dispute under Wis. Stat. § 6.50, and then argues that because no Wisconsin court has recognized a private right to compel a registration outcome under § 6.50, every count fails. But the SAC expressly disclaims that theory four separate times. It pleads that "[n]one of the Counts depends on a finding that Wis. Stat. § 6.50 creates a privately enforceable cause of action" (SAC ¶ 2); that "Plaintiffs do not claim a private right to compel any particular list-maintenance outcome" (¶ 14); that HAVA is invoked only as evidence and context, "not … as a freestanding damages cause of action" (¶ 20); and that the "principal dispute" is "whether Plaintiffs have adequately pleaded a protected interest in the genuine adjudication Defendants themselves undertook to provide" (¶ 127).

3. The real question this case presents is narrow: may government officials convene a formal adjudicatory proceeding on named citizens' submissions, place them under oath, receive their sworn evidence and legal argument, announce a denial before any genuine deliberation, apply a framework allegedly selected to guarantee denial, retreat into an allegedly unauthorized closed session, return with scripted denial language, and then publicly brand the citizens' evidence false without ever reviewing it? At the pleading stage, the SAC plausibly answers no. That is a federal claim under 42 U.S.C. § 1983, for the destruction of a state-created adjudicatory process, and it does not depend on whether § 6.50 creates a private cause of action. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982); *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982). Because the Defendants' motion never engages that theory, it does not carry their burden.

2

## STANDARD OF REVIEW

4. On a motion under Rule 12(b)(6), the Court accepts all well-pleaded factual allegations as true and draws every reasonable inference in Plaintiffs' favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint survives if it pleads "enough facts to state a claim to relief that is plausible on its face." The Court may not weigh evidence, resolve factual disputes, or choose between competing accounts; those are merits questions. And that a state-law theory may be novel (that "no Wisconsin court has ever" recognized a particular right) is not a federal pleading defect.

5. Defendants also misstate the governing standard. They contend that unless Plaintiffs can "demonstrate some merit or plausibility" to their claims the suit must be dismissed, citing *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013). Br. 3. Whatever "merit" means in that formulation, it cannot be read to require Plaintiffs to prove their claims at the pleading stage. A complaint need only "state a claim to relief that is plausible on its face," and plausibility "is not akin to a probability requirement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556-57. The question is not whether Plaintiffs will ultimately prevail, but whether they have pleaded "enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting their claims. *Twombly*, 550 U.S. at 556. To the extent *Vaughn* is read to graft a merits showing onto Rule 12(b)(6), the Rules forbid it. Moreover, *Vaughn* is a criminal case concerning the sufficiency of an indictment, not the civil pleading standard, making Defendants' reliance on it for a heightened civil burden weaker still.

3

ARGUMENT

## I. The Motion Attacks a § 6.50 Private-Right Claim the SAC Does Not Plead.

6. Defendants' organizing argument is that § 6.48 is "the exclusive process by which individuals may challenge elector registrations," so Plaintiffs were never "entitled to adjudication" and "Fourteenth Amendment Due Process does not apply." Br. 1-2. Each count is then dismissed as "derivative" of a supposed § 6.50 private right. But Plaintiffs assert no § 6.50 private right, no right to a particular outcome, and no HAVA cause of action. SAC ¶¶ 2, 14, 20. They assert a *Logan* interest in the genuine use of an adjudicatory process the government itself convened. The statutory background in the SAC (that § 6.50(3) carries no affidavit, no beyond-a-reasonable-doubt standard, and no residency requirement; that § 6.50(8) expressly authorizes use of USPS information; and that § 6.48 is a separate individualized-challenge procedure structurally incompatible with a bulk USPS-based list-maintenance submission) is not pleaded as the federal cause of action. It is pleaded to show why Defendants' § 6.48 recharacterization was plausibly pretextual. SAC ¶¶ 47-58. A motion that refutes a claim Plaintiffs never brought does not warrant dismissal of the claims they did bring.

7. The "exclusivity" premise is also wrong on the statute's face. The § 6.50(3) text Defendants quote provides that the subsection "does not restrict the right of an elector to challenge any registration under s. 6.325, 6.48, 6.925, 6.93, or 7.52 (5)" (five separate avenues, not one) and separately commands that "[u]pon receipt of reliable information … the … board of election commissioners *shall*" act. The premise on which the entire motion is built is contradicted by the statute Defendants rely upon.

4

8. Defendants' remaining § 6.50 authorities do not bridge this gap. *State ex rel. Zignego v. Wisconsin Elections Commission*, 396 Wis. 2d 391 (2021), held only that § 6.50(3) does not impose a positive and plain duty enforceable by mandamus against the Wisconsin Elections Commission; it did not address a § 1983 procedural-due-process claim arising from a sham adjudication, and it says nothing about whether a government that convenes a sworn hearing may then conduct it as a pretense. And *Bernegger v. Millis*, E.D. Wis. No. 26-cv-0003, Dkt. 19, is an unpublished, non-precedential district-court order that dismissed a HAVA private-enforcement and procedural-due-process theory the SAC here expressly disclaims (SAC ¶ 20); it does not bind this Court and does not reach the *Logan* adjudicatory-process interest the SAC actually pleads. Furthermore, the case is still open and pending on appeal.

II. Plaintiffs Have Article III Standing Because They Allege Direct, Particularized Injuries, Not a Generalized Grievance.

9. To the extent Defendants contend Plaintiffs assert only a generalized objection to how Milwaukee administers elections, the SAC pleads the opposite, and the standing attack should be rejected.

A. Gavery and Nolan allege direct hearing-participant injury, which is the antithesis of a generalized grievance.

10. A plaintiff cannot establish standing merely by objecting, as a citizen or policy opponent, to allegedly unlawful government action. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). But the plaintiffs in *FDA* were outside challengers who had only "legal, moral, ideological, and policy concerns" and no concrete, personal injury. That is the opposite of this case. Gavery and Nolan were named submitters summoned into formal governmental proceedings convened to address their specific submissions; they were placed under oath, presented evidence and legal

5

authority, and were then subjected to a proceeding alleged to have been predetermined and not genuinely deliberative. SAC ¶¶ 15, 25-31, 118-122. That is a concrete, personal, and particularized injury distinct from any abstract interest in lawful government conduct, precisely the injury *FDA* found missing. The SAC also expressly pleads that its "primary standing theory" rests on these direct adjudicatory, petitioning, and reputational injuries, not on vote dilution, which is pleaded only as "consequential and contextual" harm. SAC ¶¶ 15, 116-117, 125.

11. Defendants' reliance on *Bost v. Illinois Board of Elections*, 114 F.4th 634, 640 (7th Cir. 2024), adds nothing. They cite it for "rejecting a vote-dilution theory of standing," conceding it was "rev'd on other grounds." The Supreme Court reversed the Seventh Circuit's standing dismissal, holding that the candidate-plaintiff had standing to challenge the rules governing the counting of votes in his own election; the broader voter vote-dilution theory was not pressed before the Supreme Court. *Bost v. Illinois State Bd. of Elections*, 607 U.S. ___, 223 L. Ed. 2d 357 (2026). Defendants therefore cannot rely on the reversed Seventh Circuit decision as a clean standing bar. In all events, Plaintiffs do not rest standing on vote dilution; their injuries are the direct adjudicatory, petitioning, and reputational injuries described above.

B. Bernegger's standing rests on reputational and petitioning injury, not residency, and the WEC letter does not defeat it.

12. Defendants attack Bernegger through his non-Milwaukee residency. But residency is a requirement of a § 6.48 individual challenge or a § 5.06 administrative complaint; it is not an element of Article III injury. Bernegger's concrete injury is the public governmental discrediting of work product identified as his proprietary TITAN methodology (characterized as inaccurate, wrong, and flawed in formal proceedings, before third parties and the press, without review), combined with the denial of a genuine process in which that work product was supposedly

6

adjudicated. SAC ¶¶ 32-38, 123, 151. He need not be a Milwaukee elector to be injured when a governmental body publicly discredits work product identified as his. The Supreme Court's decision in Bost, the very case Defendants cite, confirms that "[r]eputational harms" are "classic Article III injuries," and that they are "particularly concrete" for those whose work depends on public confidence. *Bost v. Illinois State Bd. of Elections,* 607 U.S. ___, ___ (2026) (slip op. at 5-6) (citing *TransUnion LLC v. Ramirez,* 594 U.S. 413, 425 (2021)). HAVA, 52 U.S.C. § 21083, and Wis. Stat. § 6.50(3) are pleaded only to show the context of his protected petitioning and why he was a named submitter; Bernegger does not rely on HAVA as a private cause of action or as a bare procedural-injury standing theory, and his standing does not turn on either statute.

13. The Wisconsin Elections Commission's November 14, 2024 letter does not change this. That letter returned Bernegger's separate § 5.06 administrative complaint *without prejudice* on a *form* ground, that he "[is] not an elector served by these election officials," while expressly stating that the complaint "is timely and makes allegations that could form the basis of a finding of probable cause." SAC ¶ 39. That is not a merits rejection of TITAN, not a finding that Bernegger suffered no reputational injury, and not a ruling on Article III standing in this federal § 1983 action. Defendants conflate administrative gatekeeping under § 5.06 and elector-challenge standing under § 6.48 with constitutional injury-in-fact. The conflation should be rejected.

C. Defendants challenge only Bernegger's standing, and one plaintiff with standing sustains the action.

14. The motion's only developed standing challenge is directed at Bernegger. Br. 2, 10-11. Its passing invocation of Bost's vote-dilution discussion (Br. 5-6) fails for the reasons stated above: the SAC pleads vote dilution only as consequential and contextual harm, not as Plaintiffs' standing theory. SAC ¶¶ 116-117, 125. The motion does not dispute that Gavery and Nolan (the named submitters who appeared, were placed under oath, and presented evidence) have standing. Because

7

"the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," the action proceeds regardless of how the Court resolves Bernegger's standing. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Defendants' position is also internally inconsistent: standing is jurisdictional, and a court without jurisdiction over a claim may not reach its merits or dismiss it with prejudice. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). Defendants cannot at once argue that Bernegger lacks standing and that his claims should be dismissed on the merits with prejudice; at most, a standing defect would warrant dismissal without prejudice, not the merits adjudication they seek.

III. Count I States a Procedural Due Process Claim.

A. Plaintiffs pleaded a protected interest in a genuine adjudication.

15. *Logan* holds that "the right to use the [agency's] adjudicatory procedures" is "a species of property protected by the Due Process Clause," and that a State may not destroy that entitlement by refusing to conduct the proceeding it established. 455 U.S. at 428-33; accord *Cooper v. Salazar,* 196 F.3d 809, 813-14 (7th Cir. 1999) (reading Logan the same way). *Logan* is explicit about what the entitlement guarantees: "the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged." 455 U.S. at 433. Logan also forecloses Defendants' suggestion that the § 6.48 framework they selected defines all the process that was due: "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures." Id. at 432 (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)). "Indeed, any other conclusion would allow the State to destroy at will virtually any state-created property interest." Id. The SAC pleads precisely that interest: Defendants "invoked official adjudicatory machinery, scheduled and held formal hearings, administered oaths, received sworn evidence and legal argument, and purported to decide"

8

Plaintiffs' submissions (SAC ¶ 128). Having done so, they could not "destroy that adjudicatory entitlement by making the hearing a pretext, predetermining the result, or refusing genuine consideration of the evidence." *Id.*

16. Defendants' reliance on *Shvartsman v. Apfel*, 138 F.3d 1196 (7th Cir. 1998), proves the point: access to procedures protects the litigant's "underlying legal claim," and the underlying claim here is Plaintiffs' right to present their challenges, which Defendants concede is "rooted in Wis. Stat. § 6.48" (Br. 7). *Shvartsman* itself explains that the underlying claims "are the true property interests," that "the property interest in *Logan* was the underlying discrimination claim," and that "the adjudicatory process constituted the process that was due in connection with the deprivation of that property interest." 138 F.3d at 1199. And it acknowledges that where an underlying entitlement exists, its deprivation without "a meaningful, fair opportunity" to prove it "could indeed violate due process." Id. at 1200. Either Plaintiffs had a cognizable challenge to be adjudicated (so *Logan* applies), or they did not (so Defendants could not lawfully convene a sworn § 6.48 hearing and announce a denial under its standard). Defendants cannot have it both ways. *Minch v. City of Chicago*, 486 F.3d 294 (7th Cir. 2007), and *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), establish only that due process attaches to protected interests; neither addresses the *Logan* adjudicatory-process interest, and neither permits a government that convenes a sworn hearing to conduct it as a pretense.

17. Castle Rock concerned a citizen demanding police enforcement against a third party; no proceeding of any kind was convened, and the opinion nowhere addresses Logan. Plaintiffs claim no property in procedure for its own sake; they claim the Logan interest in having their properly submitted challenges decided on the merits, the very thing the convened hearings existed to do. Cf. Castle Rock, 545 U.S. at 767-68 (distinguishing withdrawal of direct benefits from government

9

action directed at third parties). Minch is further afield still: it held only that a collective bargaining agreement did not bar mandatory retirement; no hearing of any kind was at issue. 486 F.3d at 302-05.

18. Defendants' refrain that "no Wisconsin court has ever" recognized the interest Plaintiffs assert (Br. 2, 5, 7) misstates how protected interests are identified. Whether state law creates an entitlement is determined from the text and structure of state law itself, not from whether a state court has previously said so. In *Rebirth Christian Academy Daycare, Inc. v. Brizzi*, 835 F.3d 742 (7th Cir. 2016), the Seventh Circuit held, on the pleadings, that a child care ministry's certificate of registration was protected property because "[w]here state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." No Indiana court had previously recognized that interest; the Seventh Circuit nonetheless held the question was "not a close one." Likewise, in *Simpson v. Brown County*, 860 F.3d 1001 (7th Cir. 2017), the court reversed a Rule 12(b)(6) dismissal where a county board revoked a septic installer's license without prior notice or an opportunity to be heard, deriving the protected property interest from the county ordinance itself. And in *Cheli v. Taylorville Community School District No. 3*, 986 F.3d 1035 (7th Cir. 2021), the court again reversed a Rule 12(b)(6) dismissal, reiterating that "[t]he hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" (quoting *Logan*, 455 U.S. at 430). Here, § 6.50(3) commands that the board of election commissioners "shall" act upon receipt of reliable information, § 6.50(8) expressly authorizes use of USPS change-of-address data, and Defendants themselves convened sworn adjudicatory proceedings directed at Plaintiffs' specific submissions. Whether state law and that undertaking gave rise to a protected interest is resolved from the statutory text and the well-

10

pleaded allegations, taken in Plaintiffs' favor; the asserted novelty of the question is not a basis for dismissal. See also *Laurens v. Volvo Cars of North America, LLC*, 868 F.3d 622 (7th Cir. 2017) (recognizing, citing *Logan*, that a legal claim is itself property protected by the Fourteenth Amendment's Due Process Clause).

19. The same cases foreclose any suggestion that after-the-fact remedies could excuse what is alleged here. Where officials act through established procedures and broadly delegated power, rather than through "random and unauthorized" conduct, due process requires meaningful process before the deprivation. *Simpson*, 860 F.3d 1001 (officials "acting pursuant to broadly delegated power" under a county ordinance were not engaged in random and unauthorized conduct, and pre-deprivation process was required); *Armstrong v. Daily*, 786 F.3d 529, 544 (7th Cir. 2015) (the *Parratt* exception applies only where the government "could not predict the conduct causing the deprivation, could not provide a pre-deprivation hearing as a practical matter, and did not enable the deprivation through established state procedures and a broad delegation of power"); *Logan*, 455 U.S. at 436 (*Parratt* "does not control" where "it is the state system itself that destroys a complainant's property interest"); accord *Bradley v. Village of University Park*, 929 F.3d 875, 879-80 (7th Cir. 2019) (reversing judgment on the pleadings; deliberate action by officials with final authority is not "random and unauthorized," because "a complaint asserting municipal liability under *Monell* by definition states a claim to which *Parratt* is inapposite," the simultaneous violation of state law is no defense, and overlapping state remedies are "generally irrelevant" to the existence of a § 1983 claim) (quoting *Wilson v. Town of Clayton*, 839 F.2d 375, 380 (7th Cir. 1988)). The SAC alleges precisely that: a deprivation accomplished through the Commission's own convened, official adjudicatory machinery, not by a rogue actor. SAC ¶¶ 128, 131.

11

B. Defendants' own alternative argument assumes a protected interest and an adjudication, and joins issue on a factual question.

20. The brief states: "Even if Plaintiffs do have a protected interest in petitioning election officials to uphold state law, that interest is rooted in Wis. Stat. § 6.48. Thus, when Defendants allowed Gavery and Nolan to present their challenges under Wis. Stat. § 6.48 and found that their evidentiary basis was insufficient … the Plaintiffs received all the process that was due to them." Br. 7. At minimum, Defendants' alternative "even if" argument assumes for purposes of their Rule 12 motion that Plaintiffs had a cognizable petitioning or challenge interest, and then argues that the hearing was meaningful. That assumption joins issue on the dispositive factual question. By asserting that Plaintiffs received "all the process … due," meaning an opportunity to be heard "at a meaningful time and in a meaningful manner," Defendants necessarily place in dispute whether the hearing was, in fact, meaningful. That is precisely the question the SAC answers in the negative, and it cannot be resolved on the pleadings.

C. The SAC pleads a sham proceeding, which Defendants' own authority holds is sufficient.

21. The controlling line in this Circuit separates a hearing that merely reaches an adverse result from one that is a pretense. *Pugel v. Board of Trustees of the University of Illinois*, 378 F.3d 659, 666 (7th Cir. 2004), found no due-process violation there for a dispositive reason: "The complaint does not allege that these procedures were a sham." It expressly contrasted *Levenstein v. Salafsky*, 164 F.3d 345, 351-52 (7th Cir. 1998), where a plaintiff who alleged the procedures were "a sham through and through" stated a due-process violation. This SAC is on the *Levenstein* side of that line. It alleges, with specificity:

> (1) Scripted prejudgment. Commissioner Martin read the inapplicable § 6.48(2) framework, including its affidavit requirement and beyond-a-reasonable-doubt standard, into the record as a prepared script at the outset of both the October 30, 2024

12

and March 26, 2025 hearings, before Plaintiffs presented any evidence. SAC ¶¶ 81-82, 92.

(2) On-record predetermination. Before any deliberation, Martin stated he did not see the Commission moving forward, and Haag agreed they lacked "enough evidence that day," after Plaintiffs had identified each statutory basis, offered the complete data set, and cited § 6.50(8). SAC ¶¶ 95-97.

(3) Refusal to apply the governing statute. When Nolan argued on the record that § 6.50(8) authorizes USPS data and removes the reasonable-doubt standard, Block answered only that the burden remained on Plaintiffs regardless. SAC ¶¶ 84, 93.

(4) An unauthorized closed session. Defendants invoked Wis. Stat. § 19.85(1)(g) (conferring with counsel on litigation strategy) when no litigation existed or was threatened, then returned with "substantively uniform denial language," scripted uniformity supporting an inference the result was agreed in advance. SAC ¶¶ 99-107.

(5) A direct admission. After the hearing, Haag told Gavery that the Commissioners, Executive Director Gutierrez, and Block "had not reviewed the evidence … and had not intended to review it." SAC ¶¶ 17, 109. On a Rule 12(b)(6) motion that allegation is taken as true, and it is direct evidence of predetermination. The admission also places this case squarely within Doe v. Purdue University, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.), which reversed a Rule 12(b)(6) dismissal where "two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence." Id. at 663-64. The SAC alleges worse: an admission not merely of non-review, but of an intent never to review.

22. Together these allegations "plausibly allege a sham adjudication rather than a genuine one." SAC ¶ 131. They satisfy Ciechon, 686 F.2d at 517 ("Due process requires that a hearing must be a real one, not a sham or a pretense."); id. ("[n]o matter how complete the panoply of procedural devices which protect a particular liberty or property interest, due process also requires that those procedures be neutrally applied"); id. ("it is impermissible to employ those procedures vindictively or maliciously so as to deny a particular individual due process"), and Cooper v. Salazar, 196 F.3d 809 (7th Cir. 1999) (recognizing "a procedural floor below which even informal proceedings cannot go," especially where the process "results in a final dismissal of the plaintiff's claim." 196

13

F.3d at 814). Ryan v. Illinois Department of Children & Family Services, 185 F.3d 751, 762 (7th Cir. 1999), states the controlling rule: "A plaintiff who can introduce evidence that the decision has already been made and any hearing would be a sham is entitled to go forward with a procedural due process claim." Even decisionmakers who begin with tentative views satisfy due process only "so long as the decisionmakers are open to other views." Id. The SAC alleges decisionmakers open to none: the script preceded the evidence, the denial preceded the deliberation, and the evidence was never reviewed. Whether the hearings were in fact shams is for discovery and trial, not a motion to dismiss.

IV. Defendants' Transcript Argument Does Not Defeat the SAC; It Asks the Court to Resolve Factual Disputes Against Plaintiffs.

23. Defendants urge the Court to "reject as implausible" that any hearing under § 6.50 was convened, that Bernegger was identified as the source of the evidence, and that any Defendant called the evidence "inaccurate," "wrong," "flawed," or "unreliable," relying on a transcript attached to the *first* amended complaint (ECF 15-2). An incorporated document may justify disregarding an allegation only where it *conclusively* or blatantly contradicts that allegation; it may not be used to draw competing inferences in the movant's favor. The transcript does neither here, for two reasons.

24. First, it is the wrong proceeding. The SAC designates the *March 26, 2025* hearing as "the primary formal adjudicatory proceeding at issue" (SAC ¶¶ 6, 91); the October transcript is not that proceeding and cannot conclusively negate allegations about it. The SAC also pleads facts beyond any single transcript: the March 27, June 7, October 30, and November 4 submissions; the pre-selected § 6.48 script; the closed session; the absence of specific data review; the uniform post-recess denial; and Haag's post-hearing admission.

14

25. Second, even on its own terms the October transcript *corroborates* the SAC: it shows Commissioner Martin opening by reading the § 6.48 framework and its beyond-a-reasonable-doubt standard before Plaintiffs presented; Plaintiffs arguing on the record that § 6.50(8) "removes the reasonable doubt standard"; and Attorney Block repeatedly responding, "It's not our burden. It's your burden … Your burden is shifting," while Martin observed that "based on the information we have today, the burden would not be met." Those are the SAC's allegations in substance. At most, the transcript creates factual disputes about what the proceeding was, why the wrong framework was applied, what occurred in closed session, and whether the evidence was reviewed, disputes that cannot be resolved against Plaintiffs now. And to the extent Defendants ask the Court to consider matters outside the pleadings, they neither satisfied the requirements for conversion to summary judgment nor filed the statement of proposed material facts that Civil L.R. 56(b) requires.

26. Two points reinforce the impropriety of Defendants' transcript argument. First, Defendants themselves served the pro se notice required by Civil L.R. 56(a) and attached the full text of Rule 56 to their motion (ECF No. 34, at 5-10), a procedure that, by its own terms, applies to a Rule 12(b)(6) motion only "where matters outside the pleadings are presented to the Court." Civil L.R. 56(a)(2). Defendants thus concede they ask the Court to look beyond the SAC. Yet they filed no statement of proposed material facts as Civil L.R. 56(b)(1)(C) requires, and that omission "constitutes grounds for denial of the motion." Civil L.R. 56(b)(1)(C)(iii). At a minimum, treating the transcript as outside matter would convert the motion to one for summary judgment and entitle Plaintiffs to notice and an opportunity for discovery under Fed. R. Civ. P. 56(d), none of which has occurred. Second, the Court's own Notice and Order confirms the governing approach: on this motion the Court "accepts the plaintiff's allegations of fact as true" and considers only the pleadings and "documents incorporated by reference into the pleadings, that is, documents upon

which the allegations are based, such as a contract." ECF No. 37, at 1. The October transcript is not a document on which the SAC's allegations are based, and it cannot be used to negate them. Indeed, the transcript was an exhibit to the first amended complaint, a pleading that has been withdrawn. As this Court observed in granting leave to amend, "[w]hen an amended complaint is filed, the prior pleading is withdrawn and the amended pleading is controlling." ECF No. 32, at 3 (quoting *Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008)). The SAC neither attaches the October transcript nor bases its allegations upon it.

## V. Count II States a First Amendment Petition and Retaliation Claim.

27. Defendants argue the Petition Clause provides no "right to a response," citing *Wisconsin Voter Alliance v. Millis*, 166 F.4th 627, 636 (7th Cir. 2026). Br. 8. But *Millis* affirmed dismissal for lack of standing where commissioners simply *declined to review* a complaint; no hearing was convened. Millis arose on a summary-judgment record, where the plaintiffs bore a higher evidentiary burden than the pleading stage imposes, 166 F.4th at 632; its operative words were that the commissioners "did not owe a response, so they could not create a constitutional injury," id. at 636, a holding about non-response, not about how a convened, sworn adjudication must be conducted. Its own catalog of cognizable intangible injuries expressly includes "harms resembling defamation." Id. at 633.

28. Here MEC *convened* formal hearings, administered oaths, took sworn testimony, and purported to rule. SAC ¶¶ 5-6, 91. A "no duty to respond" holding does not govern a proceeding the government undertook and then corrupted; and *Millis*'s HAVA discussion is irrelevant because the SAC disclaims HAVA private enforcement. SAC ¶ 20. *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000), is no different: it held, at summary judgment, that the Petition Clause confers no right to have the government act on one's complaints, in a case where no adjudicatory

16

proceeding was ever convened; it says nothing about a government that convenes sworn hearings and allegedly predetermines their outcome. *Hilton* in fact reaffirms that "the government may not interfere with the right to petition." Id. at 1007. To be clear, Plaintiffs do not claim that *Millis*, or the Petition Clause, required MEC to respond to or officially consider their submissions. They claim that Defendants took adverse governmental action *after* Plaintiffs petitioned: Defendants convened a formal proceeding, allegedly predetermined the outcome, and publicly discredited Plaintiffs' evidence without review.

29. Plaintiffs do not claim the First Amendment required MEC to grant their petition. They claim Defendants retaliated against protected petitioning by converting the proceeding into a pretextual denial mechanism and publicly discrediting the petitioners' evidence without review. The protected activity was a course of conduct beginning long before any single hearing: the March 27, 2024 in-person challenge, the June 7 submission, the October 30 challenge and absentee-ballot submissions, the November 4 notice, and the sworn March 26, 2025 presentation. SAC ¶ 141. The adverse conduct came after and in response to that course of petitioning: recharacterizing the submission under the wrong framework before Plaintiffs spoke, announcing a predetermined denial, holding the allegedly unauthorized closed session, returning with uniform denial language, and publicly branding the evidence and Bernegger's identified TITAN work product "inaccurate, wrong, flawed, [and] unreliable" before third parties, including press, without review. SAC ¶¶ 38, 108, 142, 151. That is adverse action, not mere denial, and it "would deter a person of ordinary firmness" from future petitioning. *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009). To the extent Defendants renew the public-forum authorities from their earlier briefing (*Heffron*; *ISKCON v. Lee*), those cases are a category error the SAC itself disposes of: time-place-manner doctrine governs expression in public spaces, not a formal adjudicatory hearing convened to decide a

17

specific petition. SAC ¶ 143. *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002), and *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011), frame the analysis. The Petition Clause "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," Guarnieri, 131 S. Ct. 2488, 2494 (2011), and it protects petitioning "whenever it is genuine, not simply when it triumphs." BE&K, 536 U.S. at 532. Outside the public-employment context, that protection does not turn on a public-concern screen, Guarnieri, 131 S. Ct. at 2498, and election-list integrity is in any event quintessentially a matter of public concern.

VI. Count III States a Stigma-Plus Claim; the Standing Challenge Conflates Standing With the Merits.

30. Defendants treat Count III as ordinary defamation that worked no change in legal status. Br. 10-12. But the SAC pleads both elements of stigma-plus. The *stigma*: Martin, Ruiz-Cantu, Gutierrez, and Block characterized the TITAN workbook and USPS federal-database evidence, identified as Plaintiffs' submission, as inaccurate, wrong, flawed, and unreliable in formal public proceedings before third parties, without reviewing it. SAC ¶¶ 149-151. The *plus*: those statements were made simultaneously with the official denial of Plaintiffs' entitlement to a genuine merits-based adjudication, in a proceeding whose outcome was predetermined and which therefore afforded no meaningful opportunity to respond. SAC ¶¶ 150, 152. That pairing, official public discrediting *plus* denial of genuine process, is the classic *Paul v. Davis*, 424 U.S. 693 (1976), and *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002), structure, not a bar to it. *Doyle* is a liberty-interest holding, not a damages rule: at the pleading stage it held the complaints alleged a deprivation of occupational liberty and "state[d] a constitutional deprivation" where official findings were disclosed to third parties without a meaningful hearing. 305 F.3d at 617, 619-20. The Seventh Circuit itself reads *Doyle* that way. *Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019) (describing *Doyle* as "holding that the state deprived the plaintiffs of occupational liberty").

18

*Doe* also confirms the "plus" the SAC pleads: "[a]fter conducting an adjudicatory proceeding," the official adverse determination itself "changed John's status." Id. at 662.

31. Bernegger's injury is aggravated because TITAN is his proprietary work product, publicly identified with him as creator. SAC ¶ 151. Whether he was so identified is a disputed fact pleaded in his favor, not a question for the pleadings. Count I survives independently of Count III; Count III survives at least as an alternative theory, because the "plus" is the denial of a state-created adjudicatory entitlement, not reputational harm standing alone.

VII. Count IV States a Class-of-One Equal Protection Claim and Is Pleaded in the Alternative.

32. Defendants reframe the comparator as "private actors versus government actors" and declare them categorically different. Br. 11-12. The SAC's comparator is narrower and concrete: identical USPS-derived list-maintenance information is credited when handled internally by MEC but rejected when the same federal-database output is submitted by Plaintiffs. SAC ¶¶ 156-157. Whether parties are "similarly situated," and whether a rational basis exists, are fact-intensive questions rarely resolved on the pleadings. *Reget v. City of La Crosse*, 595 F.3d 691 (7th Cir. 2010), states the elements but does not authorize deciding them now. Defendants' rationales, namely that the data "may" have gone stale or that verification is burdensome (Br. 12), are merits arguments for summary judgment. In any event Count IV is pleaded expressly in the alternative (SAC ¶¶ 154, 159), and its dismissal would not affect the stronger due-process, petition, stigma-plus, Monell, and conspiracy theories.

VIII. Count V States a Monell Claim on Three Independent Theories.

33. Defendants argue there is no municipal liability without an underlying violation and no deliberate indifference absent a previously recognized right. Br. 12-13. That objection is

19

derivative; if any of Counts I-III survives, it fails. Moreover, the SAC pleads three independent *Monell* theories, and Defendants engage only one.

34. First, final-policymaker liability: the Commissioners' March 26, 2025 adjudicatory decision was an official act for the City, and a single decision by those with final authority is municipal action requiring no pattern and no prior notice. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); accord *Bradley v. Village of University Park*, 929 F.3d 875, 884-85 (7th Cir. 2019) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers," and "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably") (quoting *Pembaur*, 475 U.S. at 480-81, and *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405 (1997)); SAC ¶ 162.

35. Second, custom or practice: the identical prepared § 6.48(2) recharacterization script appeared at both hearings, and "[a] prepared script cannot be an improvised response," evidencing an entrenched custom. SAC ¶ 163.

36. Third, failure to train: given repeated submissions across three in-person events over more than a year, the risk was "not merely obvious … it was virtually certain." *City of Canton v. Harris*, 489 U.S. 378 (1989); SAC ¶ 164. Because the predicate violations are well pleaded and the final-decision and custom theories do not depend on deliberate indifference, Defendants' single-prong attack fails. *Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014), bars liability only where there is *no* underlying violation, not this case.

IX. Count VI States a Conspiracy Claim That Survives With the Predicate Counts.

37. Defendants concede the conspiracy claim is "derivative" and fails only if no deprivation occurred. Br. 13. Because Counts I-III and V state deprivations, the conspiracy claim survives.

20

The SAC pleads not a bare label but a sequence of acts from which an agreement may be inferred: the prepared § 6.48 script before Plaintiffs spoke, the on-record prejudgment, the closed session, the uniform post-recess denial language, the absence of any specific data review, the public discrediting of unreviewed evidence, and Haag's admission that the Commissioners, Executive Director Gutierrez, and Block had not reviewed and "had not intended to review" the evidence. SAC ¶¶ 166-170. It also pleads around the intracorporate-conspiracy doctrine by alleging conduct outside any legitimate adjudicatory function. SAC ¶ 170. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018), states the elements, each of which is met. Whether the agreement existed is discovery and summary-judgment territory, not a matter for dismissal.

## X. The Individual Defendants Are Not Entitled to Qualified Immunity at the Pleading Stage.

38. Defendants are entitled to qualified immunity only by redefining the right as a statutory right to win under § 6.50. Br. 14. The SAC instead invokes the clearly established constitutional right not to be subjected to a sham adjudication once the government undertakes formal adjudication, a right established since at least *Ciechon* (1982) and reaffirmed in *Levenstein* (1998), *Cooper* (1999), and *Pugel* (2004). Defining a right at too high a level of generality to manufacture immunity is exactly what *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011), forbids. *Levenstein* itself affirmed the denial of qualified immunity at the pleading stage, holding that clearly established law includes "the commonsense notion that fundamentally biased process is not due process" and that officials "knew that they could not offer only a phony opportunity to contest charges." 164 F.3d at 352.

39. As of 2023, the rule remains beyond debate: no reasonable official could believe that predetermining the outcome of a hearing, "no matter how that is accomplished," is "consistent with due process." *Prude v. Meli,* 76 F.4th 648, 660 (7th Cir. 2023) (reversing a grant of qualified

21

immunity on obvious-clarity grounds, without any case on identical facts). No reasonable official could believe that announcing a denial before deliberation, applying a concededly inapplicable statute to guarantee denial, invoking a litigation closed-session exemption with no litigation pending, and publicly declaring evidence false without reading it together satisfy due process. SAC ¶ 134.

40. The Seventh Circuit has likewise refused qualified immunity at the pleading stage to officials who deprived citizens of state-created entitlements without a genuine opportunity to be heard. In *Rebirth*, 835 F.3d 742, the court reinstated individual-capacity damages claims that had been dismissed on qualified-immunity grounds, holding that the law was clearly established both that a statutory entitlement is protected property and that officials could not effect the deprivation without first providing an opportunity for some type of hearing. It was no answer that the governing statute provided no hearing procedure, because nothing prevented the officials from affording one; and "[t]he salient question is not whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." *Id.* (quoting *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004)). The individual Defendants here had far clearer warning: *Ciechon* (1982), *Levenstein* (1998), *Cooper* (1999), *Pugel* (2004), and *Prude* (2023) all establish that a convened adjudication may not be conducted as a pretense, and *Rebirth* confirms that immunity does not attach merely because no prior decision addressed the precise statutory setting.

41. Qualified immunity also cannot be resolved on the pleadings where, as here, it turns on disputed facts about what Defendants knew, whether they reviewed the evidence, why § 6.48 was chosen, what occurred in closed session, and whether Haag made the admission. Defendants' own qualified-immunity authority confirms the point: in *Hanson v. LeVan* itself, the Seventh Circuit

22

affirmed the denial of qualified immunity at the pleading stage, describing the "mismatch between the 12(b)(6) plausibility standard and the often fact-intensive nature of qualified-immunity inquiries," 967 F.3d at 597, calling Rule 12(b)(6) "a poor fit for dismissal on the basis of qualified immunity," id. at 590 n.2, and reiterating that "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." Id. at 597 (quoting *Alvarado v. Litscher,* 267 F.3d 648, 651 (7th Cir. 2001)).

42. Qualified immunity is also assessed as to each official's own conduct, and the SAC pleads personal participation by each individual Defendant. See *Mabes v. Thompson*, 136 F.4th 697 (7th Cir. 2025) (evaluating each defendant's entitlement to immunity separately). Martin allegedly read the prepared § 6.48 script before Plaintiffs spoke, prejudged the matter on the record, moved to convene the closed session, coordinated the post-recess denial, and publicly discredited the evidence (SAC ¶¶ 42, 81, 92, 95, 99, 108); Ruiz-Cantu allegedly joined the closed session, voted the denial, and publicly discredited the evidence without review (¶ 43); Haag allegedly made on-record prejudgment statements, participated in the closed session, and then admitted that the evidence had not been and was never intended to be reviewed (¶¶ 41, 95, 109); and Block allegedly steered both proceedings into the inapplicable § 6.48 standard despite Nolan's § 6.50(8) argument and participated in the closed-session coordination (¶¶ 45, 83-84, 93); and Gutierrez, the Executive Director sued in her individual capacity, allegedly held and then ignored independent statutory duties to act on the USPS data, discredited the submissions without review, and was named in Haag's admission as one who never intended to review the evidence (¶¶ 13, 44, 114-115). Those allegations of personal involvement must be accepted as true at this stage.

43. In all events, qualified immunity cannot dispose of this action "in any event," as Defendants contend. Br. 14. Qualified immunity, by its terms, shields government officials only from liability

23

for civil damages. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It therefore provides no defense to the SAC's claims for declaratory and injunctive relief. Nor may the City of Milwaukee invoke it: a municipality has no qualified-immunity defense to a *Monell* claim. See *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993). Even if the individual Defendants were immune from damages (and for the reasons above they are not), the claims for prospective relief and the claims against the City would proceed.

XI. The Motion Does Not Reach Defendant Paulina Gutierrez, and the Claims Against Her Are Independently Well-Pleaded.

44. The motion does not move on Gutierrez's behalf. By its own terms, the motion is brought only by "Defendants City of Milwaukee, Douglas Haag, Kathryn Z. Block, Patricia Ruiz-Cantu, and Terrell Martin (collectively, the 'City Defendants')." Mot. 1; Br. 1. Paulina Gutierrez (a named Defendant in the SAC, sued in her individual and official capacities, and served with the summons and second amended complaint on June 4, 2026) is listed nowhere in the motion's caption or its definition of movants. A Rule 12(b)(6) motion filed by some defendants cannot dispose of claims against a defendant who did not move. Indeed, the moving Defendants' own caption omits Gutierrez entirely, confirming that the motion was never directed at the claims against her. The motion's request to dismiss "the SAC in its entirety, with prejudice" (Mot. 4) therefore sweeps further than the moving Defendants' own motion can reach. The claims against Gutierrez in Counts I, II, III, IV, and VI are not before the Court on this motion and should be expressly preserved regardless of how the Court rules on the moving Defendants' arguments.

45. The SAC independently states claims against Gutierrez that the moving Defendants' § 6.50 arguments do not reach. Even if the moving Defendants had purported to move on Gutierrez's behalf, their central premise (that liability depends on a private right to compel a list-maintenance

24

Case 2:25-cv-01970-WCG    Filed 06/16/26    Page 24 of 28    Document 38

outcome) does not fit her. Gutierrez's liability does not rest on any Commission vote or on any claimed right of Plaintiffs to a particular result. She is an executive officer charged with affirmative, ongoing, *mandatory* duties she could discharge on her own authority. Under Wis. Stat. § 7.21(1), all powers and duties assigned to the municipal clerk under chapters 5 to 12 "shall be carried out by the ... board of election commissioners or its executive director." Those duties include § 6.50(3)'s command that, upon receipt of reliable information that a registered elector has changed residence, the board "shall" act on the registration; § 6.50(8)'s authorization to obtain and use USPS change-of-address data to revise the registration list; and § 7.15(1)(g)'s duty to report suspected election irregularities to the district attorney and the Wisconsin Elections Commission.

46. The SAC alleges that Gutierrez held, and ignored, these independent duties. SAC ¶¶ 13, 44, 53, 113. The SAC alleges that she received the June 7, 2024 submission as its primary addressee and took no action for four months; that at the October 30, 2024 hearing she acknowledged on the record that primary registration with a P.O. Box is illegal, yet took no action on the 501 identified P.O. Box registrations; that she received the November 4, 2024 notice the day before the federal election and again took no action; and that at the March 26, 2025 hearing she neither requested the data for independent processing nor exercised her independent statutory authority. SAC ¶¶ 78, 86, 88, 114.

47. Haag's post-hearing admission specifically named Gutierrez among the officials who "had not reviewed and had never intended to review" the evidence, placing her not as a bystander but as a participant in the coordinated decision not to engage the submissions, and independently in breach of her own mandatory duties. SAC ¶¶ 13, 115. Those allegations state due-process, petition/retaliation, stigma-plus, and conspiracy claims against Gutierrez on their own footing; and, at the same time, the participation of the one official with independent authority to act

25

corroborates the predetermined, non-genuine character of the proceedings alleged against the moving Defendants.

XII.  Any Dismissal Should Be Without Prejudice.

48.  Defendants ask the Court to dismiss the SAC "with prejudice" and argue that amendment would be "futile" because "no Wisconsin court has ever" adopted Plaintiffs' reading of § 6.50. Br. 2. The argument fails on its own terms. The federal claims do not depend on § 6.50 creating a private right (Part I), so the asserted novelty of a state-law theory is no basis to dismiss the federal claims, let alone with prejudice. The absence of contrary state precedent is not futility; under Rule 15(a) leave to amend is freely given, and dismissal with prejudice is reserved for cases where it is "certain … that any amendment would be futile or otherwise unwarranted." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission*, 377 F.3d 682, 687 (7th Cir. 2004). At most, an unsettled question of Wisconsin law would counsel certification to the Wisconsin Supreme Court, not a merits dismissal that forecloses the claims forever. *Foster v. DeLuca*, 545 F.3d 582 (7th Cir. 2008), on which Defendants rely, holds only that leave may be denied where a proposed amendment would not cure a deficiency; it does not authorize a prejudicial dismissal of plausibly pleaded claims.

26

Defendant Gutierrez and cannot dismiss the claims against her. Plaintiffs respectfully request that the Court deny the motion to dismiss in its entirety; in the alternative, that any dismissal be without prejudice and with leave to amend, and that the claims against Defendant Gutierrez, who did not join the motion, be preserved.

Respectfully submitted,                                          Dated: June 13, 2026.


Joseph Nolan, Plaintiff
2909 South 52nd Street
Milwaukee, Wisconsin 53219
414-639-0736 • Jnolan5@wi.rr.com


Justin Gavery, Plaintiff
730 North Plankinton Avenue, Suite 7D
Milwaukee, Wisconsin 53203
408-858-4527 • justin_gavery@yahoo.com

see p. 28-2

Peter Bernegger, Plaintiff
1806 Brynnwood Trace
New London, Wisconsin 54961
920-551-0510 • pmbmap123@gmail.com


Dated June 13, 2026.

28 — 1

Justin Gavery, Plaintiff
730 North Plankinton Avenue, Suite 7D
Milwaukee, Wisconsin 53203
408-858-4527 • justin_gavery@yahoo.com

Peter Bernegger, Plaintiff
1806 Brynnwood Trace
New London, Wisconsin 54961
920-551-0510 • pmbmap123@gmail.com

Dated June 13, 2026.

28 - 2