# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PETER BERNEGGER,**
**JUSTIN GAVERY, and**
**JOSEPH NOLAN,**

        **Plaintiffs,**

        **v.**                **Case No. 25-C-1970**

**DOUGLAS HAAG,**
**TERRELL MARTIN,**
**PATRICIA RUIZ-CANTU,**
**KATHRYN Z. BLOCK,**
**CITY OF MILWAUKEE, and**
**PAULINA GUTIERREZ,**

        **Defendants.**

---

## DECISION AND ORDER GRANTING MOTION TO DISMISS

---

Three Wisconsin residents (Peter Bernegger, Justin Gavery, and Joseph Nolan) commenced this *pro se* action under 42 U.S.C. § 1983 against the City of Milwaukee, members of the Milwaukee Election Commission (MEC) (Douglas Haag, Terrell Martin, and Patricia Ruiz-Cantu), the Executive Director of the MEC (Paulina Gutierrez), and the Assistant Milwaukee City Attorney tasked with advising the MEC (Kathryn Block), for violating their constitutional rights. In their Second Amended Complaint (SAC), Plaintiffs allege that on several separate occasions, Gavery and Nolan appeared before the MEC and presented evidence supplied by Bernegger that the City of Milwaukee voter registration list includes a substantial number of voter registrations with "address validity defects." Plaintiffs allege Defendants refused to consider their evidence and, instead, discredited it, and denied Plaintiffs' challenge to the registrations. Plaintiffs assert claims for deprivation of due process, retaliation against First Amendment rights, equal protection violations, *Monell* liability, and civil conspiracy. The case is before the Court on Defendants'

motion to dismiss Plaintiffs' SAC for failure to state a claim. Dkt. No. 34. For the reasons that follow, Defendants' motion will be granted and the case will be dismissed.

**BACKGROUND**

Plaintiffs are residents of Wisconsin who voted in the November 5, 2024, general federal election. SAC ¶¶ 25, 29, 33, Dkt. No. 33. Gavery and Nolan are registered to vote in the City of Milwaukee, and Bernegger is registered to vote in Waupaca County. *Id.* ¶¶ 24, 28, 32. On multiple occasions between March 27, 2024, and March 26, 2025, one or more of the plaintiffs appeared in hearings before the MEC to present evidence challenging the City's voter registration lists. *Id.* ¶¶ 4–6. Bernegger is the developer of "the TITAN system," which the SAC describes as the "proprietary methodology" that cross-validates voter-registration data against United States Postal Service databases: Coding Accuracy Support System (CASS), Delivery Point Validation (DPV) system, and National Change of Address (NCOA) system. *Id.* ¶ 33. It was Bernegger's TITAN system that was used to generate "the evidentiary workbooks at the center of this case." *Id.*

According to the SAC, Bernegger's "TITAN workbook analyzed 271,962 active City of Milwaukee voter registrations and identified more than 56,000 with address-validity defects, including approximately 35,699 NCOA permanent movers, 6,187 confirmed out-of-state permanent movers, 4,907 confirmed out-of-county permanent movers, 5,080 registrations at USPS-designated vacant addresses, registrations with DPV-N or blank DPV indicators, and registrations at commercial or USPS facility locations." *Id.* ¶ 66. Plaintiffs allege they later refined their challenge to focus on 4,878 active Milwaukee registrations of voters who had voted in the November 5, 2024, election and showed one or more address-validity defects. *Id.* ¶ 69. Plaintiffs allege that, at each of the three hearings, Defendants summarily denied their challenges and publicly discredited Plaintiffs' submissions without reviewing them. *Id.* ¶ 7. To place Plaintiffs'

2

allegations in context, it will be helpful to describe the statutory framework governing elections in Wisconsin.

Under Wisconsin law, each municipal clerk has charge and supervision of elections and registration of voters in the municipality. Wis. Stat. § 7.15. For election law purposes, "'[m]unicipality' means city, town or village," and "'[m]unicipal clerk' means the city clerk, town clerk, village clerk and the executive director of the city election commission and their authorized representatives." Wis. Stat. § 5.02(10)–(11). Because of its substantial population, the City of Milwaukee has a municipal board of election commissioners, the MEC. Wis. Stat. § 7.20. The MEC or its executive director have all the powers and duties assigned to the municipal or county clerk unless otherwise statutorily retained or assigned. Wis. Stat. § 7.21.

Section 6.48 sets out the general procedure for challenging the registration of a voter or, in the language of the statute, an elector. Section 6.48(1)(a) authorizes "any registered elector of a municipality" to "challenge the registration of any other registered elector" by submitting to the municipal clerk or, in Milwaukee, the executive director of the MEC, "an affidavit stating that the elector is not qualified to vote and the reasons therefor." Upon receipt of such an affidavit, the clerk or director is required to mail a notification of the challenge to the challenged voter, at his or her registered address. The challenged and challenger voters are then required to appear before the clerk or, in Milwaukee, before the MEC. The procedure before the MEC is as follows:

> Upon appearing in person, objectors shall be examined, under oath, by the commissioners and testimony taken. Judgment rests with the board of election commissioners and decisions shall be rendered as soon as heard. All cases are heard and decided summarily. The commissioners shall determine whether the person objected to is qualified. If they determine that a person is not qualified, the executive director of the board of election commissioners shall change the elector from eligible to ineligible status on the registration list and shall notify the proper ward officials of the change immediately.

Wis. Stat. § 6.48(2)(b).

3

In addition to allowing individual voters to challenge registrations, Wisconsin sets out a separate procedure for periodic revisions of voter registration lists. Wis. Stat. § 6.50. That section authorizes any municipal governing body to "direct the municipal clerk or board of election commissioners to arrange with the U.S. postal service pursuant to applicable federal regulations, to receive change of address information with respect to individuals residing within the municipality for revision of the elector registration list." Wis. Stat. § 6.50(8). It also provides:

> Upon receipt of reliable information that a registered elector has changed his or her residence to a location outside of the municipality, the municipal clerk or board of election commissioners shall notify the elector by mailing a notice by 1st class mail to the elector's registration address stating the source of the information.

Wis. Stat. § 6.50(3). The statute further provides that the clerk or board is to change the voter's registration to ineligible status "if the elector no longer resides in the municipality or fails to apply for continuation of registration within 30 days of the date the notice is mailed." *Id.*

The SAC alleges Gavery and Nolan appeared before the MEC on March 27, 2024, to submit Bernegger's materials challenging voter registration lists to then-Executive Director Claire Woodall-Vogg. *Id.* ¶ 59. Director Woodall-Vogg informed Gavery on April 16, 2024, that she anticipated beginning review of the submitted materials in May 2024. *Id.* ¶ 60. Plaintiffs claim that "no meaningful review" of the submitted materials occurred. *Id.* ¶ 61. On June 7, 2024, Plaintiffs, along with other individuals, submitted materials challenging voter registration lists to Director Gutierrez (who had succeeded former Director Woodall-Vogg) and Commissioners Martin, Ruiz-Cantu, and Haag. *Id.* ¶ 63. Plaintiffs allege that Director Gutierrez and the three commissioners "took no action" between June 7, 2024, and October 30, 2024. *Id.* ¶ 68.

Plaintiffs allege that at the October 30, 2024, hearing, Commissioner Martin read aloud the full text of Wis. Stat. § 6.48(2) before Plaintiffs had a chance to present their evidence and state their position that § 6.50(8), not § 6.48(2), was the appropriate provision by which to evaluate their

4

evidence. *Id.* ¶ 81. Attorney Block then stated that § 6.48 imposed a burden of proof beyond a reasonable doubt on parties seeking to challenge voter registration. *Id.* ¶ 83. Nolan argued that § 6.50(8) authorized the use of USPS data and removed the beyond-a-reasonable-doubt standard of proof. *Id.* ¶ 84. Attorney Block replied that Plaintiffs nonetheless retained the burden of proof. *Id.* Plaintiffs allege that Commissioners Martin and Ruiz-Cantu, Director Gutierrez, and Attorney Block "discredited or dismissed Plaintiffs' evidence without meaningful review." *Id.* ¶ 85.

On November 4, 2024, Bernegger submitted his materials regarding voter registration lists to Director Gutierrez and to the MEC. *Id.* Plaintiffs allege that Gutierrez "held independent authority to act on" the data but that she nonetheless "took no action." *Id.* ¶¶ 87–88. As had occurred in the October 30 hearing, Plaintiffs allege that Commissioner Martin read § 6.48, Nolan argued that § 6.50(8) applied, and Attorney Block replied that the burden nonetheless remained with Plaintiffs. *Id.* ¶¶ 92–93. Plaintiffs allege that Commissioners Martin and Ruiz-Cantu, Director Gutierrez, and Attorney Block "again discredited or dismissed Plaintiffs' evidence without reviewing the underlying data and without asking substantive questions" about the methodology employed to compile the submitted materials. *Id.* ¶ 94. Commissioners Martin and Haag stated that they did not anticipate that the MEC had enough evidence to move forward at that time. *Id.* ¶ 95.

The Commissioners and Attorney Block then retired to a closed session. *Id.* ¶ 99. After emerging from the session, the Commissioners voted unanimously to deny Plaintiffs' challenge, saying that they had not met their evidentiary burden under § 6.48. *Id.* ¶ 107. Plaintiffs allege that shortly after the hearing, Commissioner Haag spoke privately with some of the plaintiffs and told them that the Commissioners, Director Gutierrez, and Attorney Block had not reviewed the submitted evidence and had not intended to review it. *Id.* ¶ 109.

**LEGAL STANDARD**

Defendants move to dismiss Plaintiffs' SAC under Fed. R. Civ. P. 12(b)(6). Dkt. No. 34. A Rule 12(b)(6) motion tests the sufficiency of the complaint to state a claim upon which relief can be granted. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Rule 8(a) of the Federal Rules of Civil Procedure requires a complaint to contain "(1) a short and plain statement of the grounds for the court's jurisdiction . . . ; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a). While a plaintiff does not need to plead "detailed factual allegations[,] . . . a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in the plaintiff's favor." *Chi. Tchrs. Union, Loc. 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 528 (7th Cir. 2025) (citation omitted). "[T]o defeat a motion to dismiss, a plaintiff must allege 'only enough facts to state a claim to relief that is plausible on its face.'" *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025), *reh'g denied*, No. 24-1171, 2025 WL 3060301 (7th Cir. Oct. 31, 2025) (quoting *Twombly*, 550 U.S. at 570). The complaint must state a claim for relief that is "plausible on its face," although it need not be probable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a court accepts all factual allegations as true, it need not accept as true a "legal conclusion couched as a factual allegation." *Id.*

**ANALYSIS**

Although Defendants have brought a motion to dismiss for failure to state a claim under Rule 12(b)(6) rather than for lack of subject matter jurisdiction under Rule 12(b)(1), the Court must first determine whether Plaintiffs have standing. *See Steel Co. v. Citizens for a Better Env't*,

6

523 U.S. 83, 101 (1998); *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[I]t is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."). "When a plaintiff lacks standing, a federal court lacks jurisdiction." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021) (citation omitted). Standing to sue is "a bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023).

"To establish Article III standing, plaintiffs must show they suffered an 'injury in fact' that was 'caused by the defendant and redressable by the court.'" *Wis. Voter All. v. Millis*, 166 F.4th 627, 632 (7th Cir. 2026) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). The injury in fact must be "concrete and particularized." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 417. The level of support required for standing at each stage of the litigation corresponds to that required for "any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Although a court lacking jurisdiction cannot generally rule on the merits, "a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits." *Brownback v. King*, 592 U.S. 209, 218 (2021).

The allegation that there may be people voting in Milwaukee who do not live there raises a serious question of election integrity. Votes cast by ineligible voters dilute and cancel out votes by those who are properly registered. It is presumably to guard against this danger that Wisconsin enacted § 6.48, which authorizes any voter to challenge the registration of any other voter, and § 6.50, which provides for the periodic revision of voter registration lists. But those are state laws that set out procedures to be followed by local authorities and enforced in state courts. In addition

7

to these state statutes, Congress enacted the Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 20901 *et seq.*, in the aftermath of the controversies surrounding the 2000 presidential election, which, among other purposes, sought "to establish minimum election administration standards for States and units of local government with responsibility for the administration of federal elections . . . ." Pub. L. No. 107-252, 116 Stat. 1666 (2002). But HAVA does not create any implied right of action for private litigants. *Millis*, 166 F.4th at 634.

Moreover, Plaintiffs expressly disclaim they are seeking in this action to enforce any right under § 6.48. Indeed, Plaintiffs allege that Defendants violated their rights by invoking § 6.48 in rejecting their claims. *See* SAC ¶ 58 ("By recasting Plaintiffs' submissions as § 6.48 matters, Defendants ensured application of a framework designed for individualized challenges to a bulk list-maintenance submission, thereby guaranteeing denial regardless of the quality of the evidence."). Instead, Plaintiffs allege that § 6.50 provides the standard by which their proffered evidence should have been assessed and the procedure that governed it. *Id.* ¶¶ 65, 67. At the same time, Plaintiffs deny that they have asserted any "§ 6.50 private right, no right to a particular outcome, and no HAVA cause of action." Pls.' Resp. at 4, Dkt. No. 38. Plaintiffs' argument, though difficult to follow, appears to be that the manner in which the Milwaukee election officials addressed, or failed to address, the evidence they attempted to offer by itself constitutes a violation of their constitutional rights.

Gavery and Nolan allege that they have standing because of their "direct, personal injury from the proceedings themselves." SAC ¶¶ 26, 31. They argue that they had "a concrete and particularized right not to be subjected to sham proceedings." *Id.* Bernegger alleges "his standing rests on three independent constitutional theories, each of which is separately sufficient to confer Article III standing." *Id.* ¶ 35. First, he alleges that he has standing under HAVA because the evidence he submitted to the MEC for review invoked provisions of HAVA, which, according to

8

Bernegger, creates a "federal petitioning right." *Id.* ¶ 36. Second, he argues that he has standing

under Wis. Stat. § 6.50(3) because that provision "imposes no Milwaukee residency requirement"

on persons challenging elector registrations. *Id.* ¶ 37. Finally, he argues that Defendants "publicly

characterized [his] work product as inaccurate, wrong, flawed, and unreliable without ever

reviewing it," thereby causing him "a direct, personal, professional, and reputational injury." *Id.*

¶ 38.

None of these allegations is sufficient to support a finding that Plaintiffs have standing to

sue in federal court. First, Plaintiffs' allegation that they have "a concrete and particularized right

not to be subjected to sham proceedings" amounts to nothing more than a complaint about the

procedure before the MEC. "[D]eprivation of a procedural right," without showing "some

concrete interest that is affected by the deprivation," does not establish Article III standing.

*Summers*, 555 U.S. at 496. In rejecting a similar argument, the Seventh Circuit explained in *Millis*:

> To the extent the plaintiffs think the Commissioners denied access to something tangible (a "response" on the merits of their specific complaint), they merely redefine procedural concerns as substantive. The Supreme Court narrowly constrains the tangible injury category to "physical or monetary" harms. Without proof of financial losses or bodily harm, plaintiffs must allege intangible injuries that pass muster under the Supreme Court's historical analog test.

166 F.4th at 633 (internal citation omitted). Plaintiffs have alleged no such harm.

Plaintiffs nevertheless argue they have a "claim under 42 U.S.C. § 1983, for the destruction

of a state-created adjudicatory process" under *Logan v. Zimmerman Brush Co.*, 455 U.S. 422

(1982). In *Logan*, the plaintiff's unlawful discharge claim under Illinois' Fair Employment Act

was dismissed when the state agency required to conduct initial factfinding failed to conduct the

hearing within the statutory time limit through no fault of the plaintiff. *Id.* at 426–27. The Court

held that the plaintiff had a state-created property interest in his claim that his employment was

unlawfully terminated because of his physical handicap. *Id.* at 430. After all, the Court noted, the

plaintiff's fair employment claim, "which presumably can be surrendered for value, is at least as

9

substantial as the right to an education labeled as property in *Goss v. Lopez*, [419 U.S. 565 (1975)]."

In *Shvartsman v. Apfel*, the court held that viability of due process claims such as that at issue in *Logan* depends not in the procedures themselves, but in the "underlying legal claims, which are the true property interests." 138 F.3d 1196, 1199 (7th Cir. 1998); *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."). *Logan*, therefore, has no application here because Plaintiffs have failed to identify any constitutionally protected liberty or property interest.

Plaintiffs, or at least Bernegger, also suggest that the characterization of Bernegger's evidentiary materials as "inaccurate, wrong, flawed, and unreliable in formal public proceedings before third parties, without reviewing it" created a "stigma" that, together with the denial of a hearing, deprived them of the kind of liberty or property interest recognized by the Court in *Paul v. Davis*, 424 U.S. 693 (1976). In *Paul v. Davis,* the Court rejected the plaintiff's claim that the local police chief's distribution of a flier listing his name as an active shoplifter, by itself, deprived him of a liberty or property interest without due process of law. *Id.* at 701. Defamation alone, the Court held, does not constitute a denial of due process. *Id.* at 702. Instead, defamation, plus a resulting change in the legal status of the plaintiff, so-called "stigma-plus," is required to state a due process claim. *Hinkle v. White*, 793 F.3d 764, 768 (7th Cir. 2015).

*Paul v. Davis* has no application here. Not only have Plaintiffs failed to allege any change in their legal status (the plus), they haven't even alleged the defamation (the stigma). The allegation that the defendant election officials found their evidence "inaccurate, wrong, flawed, and unreliable" is not defamatory to Plaintiffs and creates no stigma. It is the natural conclusion that any adjudicatory body draws when it performs its duty of assessing the evidence presented by

10

the parties and rules against the party with the burden of proof.  Even if it could be viewed as some sort of stigma, Plaintiffs have failed to allege any change in their legal status accompanying it.

As noted above, the allegation that there are people voting in Milwaukee who do not live there, if true, poses a serious problem for election integrity.  Loss of confidence in our elections can seriously damage the country.  This loss of confidence constitutes an injury to the public, and the representatives of the public, whether state or federal, have the authority and duty to protect the public from such injuries.  Individual voters, such as Plaintiffs, however, do not have Article III standing to sue in federal court to correct such problems, absent a specific harm.  The Seventh Circuit held as much in *Bost v. Illinois State Board of Elections*, 114 F.4th 634 (7th Cir. 2024), *reversed on other grounds*, 607 U.S. 71 (2026).

In *Bost*, a group of voters and candidates challenged a state law requiring election officials to count ballots received after the day of the election as long as they were postmarked on or before the day of the election or if they were accompanied by a certification signed and dated within the same timeframe.  *Id.* at 638.  In affirming the district court's decision dismissing the action, the court rejected the plaintiffs' argument that they had standing as voters.  In so ruling, the court explained:

> even if we were to accept Plaintiffs' premise that inclusion of these ballots would cause vote dilution, their votes would be diluted in the same way that every other vote cast in Illinois prior to Election Day would be diluted.  Thus, to the extent Plaintiffs would suffer any injury, it would be in a generalized manner and not "personal and individual" to Plaintiffs, as the Supreme Court requires.

*Id.* at 640 (quoting *Spokeo*, 578 U.S. at 339).  The same is true here.  Any injury Plaintiffs as voters suffer as a result of non-residents voting in Milwaukee elections is the same as any other voter. They therefore lack standing to sue in federal court.

None of the authorities cited by Plaintiffs support their argument that the initiation of an adjudicatory process by a governmental agency creates a protected liberty or property interest in

11

the adjudication absent an underlying entitlement grounded in state law. Furthermore, even if Plaintiffs could establish that a constitutional violation had occurred, that in itself would not be sufficient to confer standing. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482 (1982) ("[T]he Art. III requirements of standing are not satisfied by 'the abstract injury in nonobservance of the Constitution asserted by . . . citizens.'"). Since the Court concludes that Plaintiffs have not established the existence of a protected interest at the first step of the due process inquiry, there is no need to proceed to the second step. Plaintiffs thus have no standing to bring a claim for violation of due process under § 1983. They similarly lack standing as to their claims for retaliation and equal protection.

## CONCLUSION

Since Plaintiffs have failed to allege an injury in fact regarding their claims for violation of due process, retaliation, and violation of equal protection, there is no need to address Plaintiffs' claims regarding qualified immunity, *Monell* liability, or civil conspiracy, since all of these claims presuppose a constitutional violation.

**IT IS THEREFORE ORDERED** that Defendants' motion to dismiss Plaintiffs' Second Amended Complaint (Dkt. No. 34) is **GRANTED**. Plaintiffs' claims are dismissed without prejudice for lack of standing. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 7th day of August, 2026.

_____
William C. Griesbach
United States District Judge

12